UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TONYA RUSSELL, | CASE NO. 1:23-CV-01748-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Tonya Russell challenges the Commissioner of Social Security's denial of disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). In September 2023, the parties consented to my exercising jurisdiction pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (ECF #6). Following review, and for the reasons stated below, I **REVERSE** the Commissioner's decision and **REMAND** for additional proceedings consistent with this decision.

## PROCEDURAL BACKGROUND

Ms. Russell filed for DIB and SSI in November 2020, alleging a disability onset date of March 22, 2018. (*See* Tr. 70, 80, 211). The claims were denied initially and on reconsideration. (Tr. 71-79, 81-91, 93-100, 102-111). Ms. Russell then requested a hearing before an Administrative Law Judge. (Tr. 137-38). Ms. Russell (represented by counsel) and a vocational expert (VE) testified before the ALJ on June 29, 2022. (Tr. 42-69). On August 24, 2022, the ALJ determined Ms.

1

Russell was not disabled. (Tr. 7-36). The Appeals Council denied Ms. Russell's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Ms. Russell timely filed this action on September 7, 2023. (ECF #1).

FACTUAL BACKGROUND

## I.    PERSONAL AND VOCATIONAL EVIDENCE

Ms. Russell was 46 years old on the alleged onset date, and 50 years old at the administrative hearing. (Tr. 71). She completed high school and worked toward a bachelor's degree but did not complete the program. (Tr. 57). She has worked as an infection control monitor and preschool teacher. (Tr. 63).

## II.    RELEVANT MEDICAL EVIDENCE

On March 27, 2018, following a motor vehicle collision, Ms. Russell presented at the emergency department for evaluation where she reported moderate upper back pain. (Tr. 546). Physical examination was normal except findings of moderate thoracic paraspinal and midline tenderness. (Tr. 547). Imaging of the thoracic spine was unremarkable. (Tr. 545). The treating provider diagnosed thoracic strain and discharged her in ambulatory condition. (Tr. 553).

On April 20, 2018, Ms. Russell returned to the emergency department with continued pain from the motor vehicle collision, including headaches, crampy abdominal pain with nausea and intermittent diarrhea, and back pain. (Tr. 574). She also endorsed difficulty sleeping. (*Id.*). Physical examination revealed mild soreness to palpation of the cervical paravertebral musculature, mild tenderness to palpation over the thoracic and lumbar spine and related musculature, and diffuse abdominal tenderness with palpation. (Tr. 576). CT scans of the brain, cervical spine, and

2

abdomen were normal. (Tr. 577-80). The treating provider determined the findings did not support a diagnosis of concussion but were consistent with a tension headache secondary to the motor vehicle collision. (Tr. 583). Ms. Russell received prescriptions for ibuprofen, Norflex, and Zofran. (*Id.*).

On May 16, 2018, Ms. Russell met with Mary Vargo, M.D., at the Physical Medicine & Rehabilitation Clinic (PM&R) for concussion and mild traumatic brain injury evaluation. (Tr. 324). She described multiple symptoms occurring after the accident including intense nausea and vomiting that did not improve much over the first several weeks, headaches and head pressure, cognitive changes, light sensitivity, and sleep disturbance. (*Id.*). Nausea and vomiting have since improved but are severe at times. (Tr. 325). Headaches are generalized or occur in variable locations and are triggered by too much activity or too much time outside in bright light. (*Id.*). Initially, the headaches became intolerable after 40 minutes of light household tasks but have since improved. (*Id.*). She continues to be forgetful, but the difficulty she experienced with getting words out immediately after the accident had improved. (*Id.*). She described dizziness and imbalance with reaching. (Tr. 327). Her symptoms worsen with both physical and mental activity. (Tr. 326). Lifting weight, such as picking up one of her children, aggravates headaches, nausea, and fatigue. (Tr. 325).

Physical examination revealed bilateral paraspinal neck tenderness, guarded neck motion in all directions, and nystagmus present with extreme left gaze. (Tr. 327). Coordination was intact and gait was within normal limits, except Ms. Russell walked slowly and cautiously when tandem walking. (*Id.*). Results of intermediate memory, concentration, delayed recall, and balance testing revealed moderate cognitive difficulties and mildly impaired balance. (Tr. 329). Dr. Vargo

prescribed gabapentin for headaches and head pressure and Zofran for nausea, encouraged Ms. Russell to continue with physical therapy, and counseled her that concussion prognosis for eventual full recovery is good. (*Id.*).

Ms. Russell subsequently returned to PM&R, reporting some headache improvement with gabapentin, a stronger ability to tolerate light, and improved energy levels. (Tr. 333). She complained of memory changes including remembering appointments and medications and keeping up with conversations; pain and tingling in her right hand, forearm, and elbow; occasional blurry vision, dizziness, and nausea with reading; feeling more emotional generally; and not feeling refreshed even with adequate sleep. (Tr. 334). She admitted attending just two or three physical therapy sessions because her son had been hospitalized for observation related to migraines. (*Id.*). Physical examination findings were unchanged from her previous visit. (Tr. 337). Dr. Vargo referred her for speech therapy for cognitive evaluation and treatment, occupational therapy to evaluate functional living skills, vision therapy, and rehabilitative psychology for adjustment and coping. (Tr. 338). She encouraged Ms. Russell to continue physical therapy. (*Id.*).

On July 9, 2018, Ms. Russell underwent a mental health assessment where she recounted her symptoms after the accident and reported a decrease in the frequency and severity of her headaches, persistent anxiety while driving, and right arm pain when writing. (Tr. 342). During the appointment, Ms. Russell was tearful and anxious, but she maintained concentration, displayed a logical thought process, did not have abnormal thought content, and showed good insight and judgment. (Tr. 345). Felicia Fraser, Ph.D., concluded Ms. Russell had post-concussion syndrome and an adjustment disorder with mixed anxiety and depression. (Tr. 346). Ms. Russell attended individual appointments with Dr. Fraser on July 17, 22, and 28, September 4 and 20, and October

4

9, 2018. (Tr. 359-60, 398-99, 409-10, 440-41, 473-74, 491-92). On October 9, she reported successfully substitute teaching at her children's school. (Tr. 491).

On July 17, 2018, Ms. Russell underwent a speech-language pathology evaluation where she described poor attention and memory, such as forgetting to take medications and losing track of her thoughts mid-conversation. (Tr. 351). Tests designed to evaluate thought processing, memory, aphasia, and auditory comprehension revealed moderate deficits in memory, problem-solving, and organization; mild deficits in auditory comprehension, verbal expression, and attention; and normal functioning in reading comprehension, orientation, insight, pragmatics, speech, and hearing. (Tr. 352-53). The tests confirmed marked deficits in immediate memory, problem solving, and reasoning, and mild deficits in delayed recall. (Tr. 354). She was diagnosed with moderate cognitive communication disorder and was scheduled for speech-language therapy. (*Id*.).

Ms. Russell attended 11 therapy sessions between August 7 and December 20, 2018. (Tr. 365-66, 384-85, 404-05, 422-23, 434-35, 453-56, 465-66, 486-87, 497-500, 520-22). On October 11, she reported substitute teaching four days a week for a full day and felt "about 75-80% back to baseline functioning." (Tr. 497). On December 20, Ms. Russell reported substitute teaching almost every day and stated she was 80% back to baseline functioning. (Tr. 520). She felt speech therapy was no longer necessary. (*Id*.). She was discharged that day and noted to have made progress in the areas of attention, memory, problem solving and organization. (Tr. 522).

On August 7, 2018, Ms. Russell attended a neurological occupational therapy evaluation where she described issues with memory and handwriting. (Tr. 370). She did not have a headache that day but had headaches the past two days. (Tr. 372). She also described fatigue and pain with

writing more than a sentence and occasional dizziness. (*Id.*). Visual screening revealed right eye weakness and left eye hesitation, and Ms. Russell complained of increased head and stomach discomfort with testing. (*Id.*). Physical examination revealed some upper extremity weakness. (Tr. 373).

Ms. Russell attended five occupational therapy sessions between August 30 and October 2, 2018 (Tr. 415-18, 427-30, 446-48, 458-61, 479-81). The therapist commented that anxiety was often a barrier to recovery and noted that performance on some tasks, such as infinity walking while reading out alternating columns on a chart, is completely normal and without error, but she "deteriorates with unfamiliar staff, new tasks, and perception to testing environment." (Tr. 460).

On August 15, 2018, Ms. Russell returned to PM&R, complaining of bilateral radiating headaches and reporting that gabapentin had become less effective. (Tr. 390). She also stated she did not need Zofran as much anymore, taking just one or two in the past month. (Tr. 389). Dr. Vargo continued gabapentin and prescribed Zoloft for mood, anxiety, and pain coping. (Tr. 393).

On October 15, 2018, Ms. Russell returned to PM&R and complained of a recent two-week period of migraines and nausea, and more recently, headaches two or three times a day lasting 30 minutes to a few hours. (Tr. 504). She reported the intensity of her headaches had improved since her car accident; her memory, speech, and anxiety have improved, and she can read better. (Tr. 504-05). She also complained of irritable bowel syndrome (IBS) symptoms. (Tr. 509). Dr. Vargo increased the dosage of gabapentin, continued Zoloft, prescribed Maxalt for migraines, and referred her to a nutritionist. (*Id.*).

On October 16, 2018, a brain MRI revealed evidence of sequela of a previous microhemorrhage that could represent a focus of shear injury but was otherwise normal. (Tr. 621).

On January 16, 2019, Ms. Russell returned to PM&R and reported "overall doing well." (Tr. 526). She noted speech therapy helped with her concentration, but occupational therapy increased her nausea and dizziness, so she stopped attending. (Tr. 526). Her headaches were "really bad" a couple times a week, located mostly on the right side and radiating from the back to the front. (Tr. 527). Physical examination showed mild bilateral paraspinal neck tenderness and some decreased strength with hip flexors, dorsiflexion and knee extensors, and plantar flexors. (Tr. 530). Dr. Vargo refilled prescriptions for gabapentin and Maxalt, but not Zoloft because Ms. Russell had stopped taking it. (Tr. 531).

On February 20, 2019, Ms. Russell met with pain medicine specialist Kenneth Grimm, D.O., for evaluation of her widespread pain. (Tr. 901-02). Documenting Ms. Russell's history, Dr. Grimm noted the following:

> [She] had some difficulty focusing on any particular complaint but apparently has been troubled with a several year history of intermittent right upper extremity paresthesias and weakness as well as vague symptoms involving both lower extremities. She is currently denying recent motor or sensory changes. . . . [She] denies other associated neurologic signs or symptoms.

(Tr. 901). Physical examination revealed slightly diminished peripheral pulses in the upper and lower extremities without peripheral edema but was otherwise normal. (Tr. 902). Dr. Grimm ordered Ms. Russell to obtain a full neurologic evaluation. (*Id.*).

On March 15, 2019, a lower extremity arterial study showed no signs of significant arterial occlusive disease. (Tr. 671). Venous reflux testing revealed deep reflux in both lower extremities. (Tr. 675).

On March 28, 2019, a cervical spine MRI showed broad-based posterior disc osteophyte complex at C3-C4, C4-C5, and C5-C6, with minimal narrowing of the right neural foramen at C3-

C4 and significant indentation of the spinal cord and mild-to-moderate central canal stenosis at C4-C5. (Tr. 679). The interpreting physician felt this represented multilevel cervical spondylosis. (Tr. 680).

On April 3, 2019, at her husband's insistence, Ms. Russell called Dr. Grimm's office to report several recent instances of losing her balance and, less often, falling down. (Tr. 897-98). Dr. Grimm directed Ms. Russell to go to the emergency department. (Tr. 898).

On April 12, 2019, Ms. Russell met with Erin Newton, M.D., to establish care. (Tr. 1373). She endorsed a history of migraines, fibromyalgia, concussion after the car accident complicated by a microhemorrhage, memory issues, and feeling like she is going to fall. (*Id.*). She also reported vague complaints of chronic pain, difficulty writing, feeling exhausted, and having chest pain for a few days. (*Id.*). On physical examination, her chest wall was tender and palpation reproduced her symptoms. (Tr. 1378). Dr. Newton considered this was consistent with costochondritis and prescribed ibuprofen. (Tr. 1379).

On April 15, 2019, a brain MRI was normal. (Tr. 681).

On April 22, 2019, Ms. Russell met with Yuebing Li, M.D., for evaluation of chronic pain. (Tr. 895-97). There, she described her headaches and post-concussion syndrome, right arm numbness from the elbow to the hand, whole body pain, difficulty with writing, poor memory, and falling down often. (Tr. 895). She endorsed falling two to three times a week and almost falling two to three times daily. (*Id.*). Dr. Li noted the presence of astasia-abasia[1] and "apparent effort-related weakness"; otherwise, physical, cranial nerve, motor, reflex, sensory, and coordination

---

[1]    Astasia-abasia is "[t]he inability to either stand or walk in a normal manner; the gait is bizarre and not suggestive of a specific organic lesion[.]" 80290 Astasia-abasia, *Stedman's Medical Dictionary* (updated Nov. 2014).

8

examinations were normal. (Tr. 896-97). His treatment note indicates he did not have a good explanation for Ms. Russell's complaints of intermittent arm pain and widespread pain following her car accident and "d[id] not see objective evidence of neuropathy including both large fiber or small fiber neuropathy." (Tr. 897). Dr. Li recommended Ms. Russell undergo EMG/NCS testing of the right arm and leg. (*Id.*).

On April 29, 2019, Ms. Russell returned to Dr. Newton's office and complained of falling and nearly falling more often. (Tr. 1360). She also described short-term memory issues, such as losing her keys or putting them in the fridge, forgetting her children's names, and pausing often to collect her thoughts when speaking. (*Id.*). On physical examination, Dr. Newton noted normal gait, normal heel-to-toe walking, and a "very unsteady" duck walk test. (Tr. 1365). The doctor also observed bruising over the right knee. (*Id.*). Dr. Newton prescribed a walker, referred her to a neurologist, ordered a course of physical therapy for fall prevention, and directed her to wean off gabapentin to see if this decreased her falls. (Tr. 1366).

On May 17, 2019, EMG testing revealed very mild right carpal tunnel syndrome without evidence of nerve damage. (Tr. 890).

On June 5, 2019, Ms. Russell received a cervical epidural steroid injection at C6-C7. (Tr. 772).

On June 26, 2019, Ms. Russell returned to Dr. Newton's office for a follow-up appointment, where she complained of migraines, blurred vision, and leg cramps. (Tr. 1338-39). She had weaned off gabapentin and noted she continued to fall but this was improving. (*Id.*). Physical examination was normal. (Tr. 1343-44). Dr. Newton prescribed Imitrex for migraines and encouraged Ms. Russell to maintain her physical therapy and neurology appointments. (Tr. 1344).

On July 12, 2019, a thoracic spine MRI revealed mild disc desiccation at multiple levels without significant posterior disc bulge, central canal stenosis, or neural foraminal narrowing at any level. (Tr. 682). A lumbar spine MRI showed a small, broad-based posterior disc bulge with a right-sided annular tear at L3-L4 and a small, broad-based posterior disc bulge with a left-sided annular tear at L4-L5. (Tr. 683-84). The MRI did not show any central canal stenosis or neural foraminal narrowing. (*Id.*).

On July 17, 2019, Ms. Russell presented at the emergency department after losing her balance and falling, hitting her head on a wall. (Tr. 688, 736). She had a large bruise to her left hip. (Tr. 736). She reported a history of multiple falls since her car accident and endorsed left hip pain. (Tr. 688). She had a cane with her at the hospital that she used to help ambulate but denied using it at home. (Tr. 701, 756). Initial workup and physical examination were normal, imaging did not show any acute fracture, and a brain CT was normal, but Ms. Russell was admitted for observation of her persistent hip pain and monitoring for arrythmia as the cause of her fall. (Tr. 686-88, 691, 693, 731).

During admission, Ms. Russell underwent a cardiovascular workup. (Tr. 700-05). She reported poor balance with falls occurring about twice a day for the past eight months and using a cane when out of the house. (Tr. 701, 728). She endorsed a history of falls and blackouts, fibromyalgia, IBS, overactive bladder symptoms, the development of a squint since her car accident, and post-concussive syndrome. (*Id.*). Sometimes she loses consciousness for a few seconds, feels out of it, has a blank stare, and can hear things around her but cannot move. (*Id.*). Physical examination showed a medial deviation of the left eye but was otherwise normal. (*Id.*). An EKG revealed "incomplete right bundle branch block" without evidence of acute coronary

10

syndrome or orthostatic hypotension. (*Id.*). The cardiologist concluded the cause of Ms. Russell's falls was not cardiac in nature and recommended an echocardiogram, an outpatient four-week event monitor, consultation with a neurologist, and consultation with an expert in autonomic neuropathy if the general neurology workup was negative. (*Id.*). Ms. Russell was diagnosed with a closed head injury, contusion of the left hip, hypokalemia, and syncope and was discharged in stable condition. (Tr. 705, 707).

During a follow-up appointment with Dr. Newton on July 29, 2020, Ms. Russell endorsed decreased pain sometimes, though she still feels weak and fatigued. (Tr. 1172). She developed a hematoma on her hip, but it was improving. (Tr. 1173). For hip pain, Ms. Russell reported taking Tramadol three times a day. (*Id.*). She denied other falls. (*Id.*). Ms. Russell also reported continued headaches. (Tr. 1177). She stated Imitrex was not effective and she could not tolerate Topamax. (*Id.*). Dr. Newton provided a short-term refill of Tramadol and encouraged Ms. Russell to see her neurologist. (*Id.*).

On August 15, 2019, Ms. Russell returned to Dr. Newton's office for a follow-up appointment. (Tr. 1312). She reported her recent neurology appointment and the neurologist's impression that her symptoms were mostly related to a psychosocial component and resolving post-concussion syndrome. (Tr. 1312). She also indicated falling three days before, hurting her right wrist and elbow. (*Id.*). On physical examination, Dr. Newton noted the left hip bruise had resolved and Ms. Russell had small bruises over her right wrist and elbow. (Tr. 1318).

On September 5, 2019, Ms. Russell met with Dr. Newton and requested a prescription for a wheelchair. (Tr. 1304). Dr. Newton acquiesced but advised Ms. Russell to only use it for very long distances because she needs to walk. (Tr. 1310).

11

On November 20, 2019, Ms. Russell received a cervical epidural steroid injection. (Tr. 768-69).

On December 3, 2019, Ms. Russell attended a physical therapy evaluation for decreased endurance and gait abnormality. (Tr. 876). There, she described feeling worse after receiving the cervical injection, her legs feel weak, she has shooting pain down her spine, and she has been falling for unknown reasons. (Tr. 877). Ms. Russell had a cane but had not been using it. (Tr. 877). She displayed moderate limitations with lumbar range of motion testing, some diminished lower extremity strength, and an antalgic gait pattern with a flexed trunk posture. (Tr. 878).

On December 18, 2019, Ms. Russell met with Dr. Newton and complained of severe fatigue for about a month, never feeling rested even after eight hours of sleep, a recent fall resulting in a bruised knee, and uncontrolled migraines. (Tr. 1297).

On January 9, 2020, Ms. Russell met with Gail Bujorian, APRN-CNS, at the Hematology Oncology Clinic for evaluation of her low white blood cell count, otherwise known as leukopenia. (Tr. 1156). There, Ms. Russell reported a one-year history of profound fatigue and daytime sleepiness, chronic cough, shortness of breath, generalized joint pain and swelling, hand pain, and knee pain. (*Id.*). Physical examination was normal. (Tr. 1158). Based on Ms. Russell's symptoms and bloodwork showing positive antinuclear antibodies (ANA), Nurse Bujorian recommended she return to her primary care doctor and request a referral to a rheumatologist. (Tr. 1160).

On January 17, 2020, Ms. Russell met with Julia Bucklan, D.O. for evaluation of her headaches. (Tr. 867). She described headaches three times a day, associated with phonophobia, nausea, dizziness, and neck pain. (Tr. 868). On physical examination, Ms. Russell had tenderness to palpation of the cervical spine and upper trapezius, suboccipital tenderness, and normal range

12

of motion. (Tr. 870). Gait testing and neurological examination were normal. (*Id.*). Dr. Bucklan ordered Botox injections. (Tr. 871).

On February 3, 2020, Ms. Russell called Dr. Bucklan to report a severe headache lasting three to five days that improved only slightly with bed rest. (Tr. 856). Dr. Bucklan prescribed a steroid taper for relief. (Tr. 857).

On February 14, 2020, Ms. Russell met with rheumatology specialist Robert Perhala, M.D., for evaluation of her fatigue, pain, and low white blood cell count. (Tr. 2011). Physical examination revealed a slightly antalgic gait and tenderness in the elbows, wrists, finger joints, knees, and toes for a total of 26 tender joints that are consistent with rheumatoid arthritis. (Tr. 2012-14). Dr. Perhala felt Ms. Russell had inflammatory polyarthropathy, a form of inflammatory arthritis. (Tr. 2014). He prescribed hydroxychloroquine sulfate and methylprednisolone. (*Id.*).

On April 20, 2020, Dr. Bucklan administered Botox injections. (Tr. 837).

On April 24, 2020, Ms. Russell met with Dr. Perhala for a follow-up appointment. (Tr. 2015). Lab results confirmed a positive ANA and lymphopenia. (Tr. 2016). Dr. Perhala prescribed a more prolonged course of steroids and continued her prescription for hydroxychloroquine sulfate. (*Id.*).

On May 26, 2020, Ms. Russell returned to Dr. Perhala's office for a follow-up appointment, complaining of stiffness and pain in the hands, wrists, shoulders, knees, feet, and ankles. (Tr. 2017). She endorsed mild fatigue. (*Id.*). Physical examination revealed 26 tender joints and a slightly antalgic gait. (Tr. 2018-19). Dr. Perhala prescribed diclofenac gel for her knees. (Tr. 2020). At follow-up appointments on August 11, September 1, and October 27, 2020, Dr. Perhala made similar findings. (Tr. 2022-23, 2026-27, 2030-31). At the appointment in May, he

13

recommended sulfasalazine in conjunction with hydroxychloroquine sulfate, but Ms. Russell expressed reticence to try the new medication and did not start taking it until September and stopped after a short course of the drug. (Tr. 2019, 2025, 2029). Dr. Perhala explained it was a long-term medication and directed her to start taking it again. (Tr. 2032).

On July 15, 2020, Ms. Russell met with pain management physician Abdallah Kabbara, M.D., for evaluation of shooting and throbbing pain at the base of her neck that radiates to her shoulder blades and arms, back pain, and right-hand numbness. (Tr. 1502-09). She reported little improvement with an epidural steroid injection. (*Id*.). Physical examination revealed bilateral tenderness of the cervical facets and pain with palpation. (Tr. 1507). Dr. Kabbara ordered lumbar and cervical X-rays. (Tr. 1508). He also recommended cervical medial nerve branch blocks and, if the blocks improved her pain, to proceed with radiofrequency ablation to denervate the area. (*Id*.).

On July 16, 2020, Ms. Russell met with Dr. Newton and complained of fatigue, pain, and falling frequently. (Tr. 1251). Dr. Newton observed that Ms. Russell was slow to rise from her chair and used a cane. (Tr. 1256).

On July 20, 2020, Ms. Russell met with Dr. Bucklan and reported 15 moderate-to-severe headache days and zero mild headache days per month, with Botox treatment wearing off after about 4 weeks. (Tr. 806). She received a second Botox injection. (Tr. 807).

On July 29, 2020, Dr. Kabbara administered medial nerve branch blocks to the left cervical spine at C3-C4 and C4-C5. (Tr. 1513). In September 2020, Ms. Russell underwent radiofrequency ablation of the left medial nerve branch at C3-C4 and C4-C5. (Tr. 1512). She had a positive response to the procedure. (Tr. 1133).

14

On August 6, 2020, Ms. Russell had a severe migraine in the morning that decreased to a dull headache in the afternoon. (Tr. 803). When the migraine was severe, she could not lift her head from the pillow because of the pain. (*Id.*). She called Dr. Bucklan's office and reported the first Botox injection was effective for three weeks and the second injection helped for one week before the headaches returned. (*Id.*).

On October 15, 2020, Dr. Kabbara administered medial nerve branch blocks to the right cervical spine at C3-C4 and C4-C5. (Tr. 1511). On October 26, 2020, Ms. Russell met with Dr. Kabbara and reported having some benefit after the procedure, including some headache relief, and opted for another radiofrequency ablation. (Tr. 1128). On November 10, 2020, Ms. Russell underwent radiofrequency ablation of the right medial nerve branch at C3-C4 and C4-C5. (Tr. 1510).

On November 19, 2020, Ms. Russell presented at the emergency department with a migraine lasting three days, with associated nausea, vomiting, and mild photophobia. (Tr. 1119). Her symptoms "improved remarkably" after receiving Reglan, Benadryl, magnesium, Toradol, and IV fluids. (Tr. 1121). Ms. Russell was discharged with prescriptions for Toradol and Zofran. (*Id.*).

On November 30, 2020, Ms. Russell met with Dr. Bucklan to receive a third Botox injection for migraines. (Tr. 790). Dr. Bucklan noted that before Botox treatment, Ms. Russell reported 15 moderate-to-severe and 15 mild migraine days a month, with zero headache-free hours. (*Id.*). After treatment, Ms. Russell reported 10 moderate-to-severe and 5 mild migraine days a month and that the effectiveness of the treatment wore off after 10 weeks. (*Id.*). Dr. Bucklan also prescribed prednisone and Ubrelvy.

15

On December 23, 2020, at a follow-up appointment with Dr. Kabbara, Ms. Russell reported the radiofrequency ablation on the right side was not as effective as the procedure on the left side. (Tr. 1489). She described tenderness with palpation of the right occipital nerve. (Tr. 1494). Dr. Kabbara recommended a cervical epidural steroid injection and a C2 ganglion block. (Tr. 1489).

On January 27, 2021, Ms. Russell returned to Dr. Perhala's office and described fair control of her arthritis and a recent increase in joint pain, especially in the right hand, knee, and toes. (Tr. 2033). On physical examination, Dr. Perhala noted a slightly antalgic gait and 26 tender joints. (Tr. 2034). He determined the inflammatory polyarthropathy was active and consistent with seronegative rheumatoid arthritis. (Tr. 2035). Because hydroxychloroquine and sulfasalazine were only partially effective, Dr. Perhala added methotrexate to her prescription regimen. (Tr. 2035-36). He also administered intramuscular Depo Medrol, a corticosteroid, for her arthritis flare-up. (Tr. 2035).

On January 29, 2021, Ms. Russell attended an initial evaluation for physical therapy to address her difficulty walking. (Tr. 1470). There, she reported falling more than four times in the past six months and described multiple episodes of almost falling. (*Id*.). Ms. Russell endorsed fatigue in her legs and a history of memory issues. (Tr. 1471). She keeps an assistive device in her car but does not use it. (*Id*.). The therapist observed a "swaying, almost ataxic-looking gait" with guarded posture and hesitation. (*Id*.).

On March 1, 2021, Ms. Russell sent a message to Dr. Bucklan's office about having a severe migraine for two days. (Tr. 1754).

16

On March 8, 2021, Ms. Russell returned to Dr. Bucklan's office for a fourth treatment with Botox injections. (Tr. 1556).

On March 10, 2021, Ms. Russell met with Dr. Perhala and reported feeling a bit better. (Tr. 2037). She did not know if it was the methotrexate or the Depo Medrol that helped. (*Id.*). Dr. Perhala continued her medications. (Tr. 2039-40).

On March 18, 2021, Ms. Russell presented at the emergency department for bilateral leg pain radiating from her thighs to her knees that she attributed to a rheumatoid arthritis flare-up. (Tr. 1549). She also described recent chest pain, specifically in the bones of her ribcage. (*Id.*). Workup and evaluation were normal, and Ms. Russell's pain improved with Toradol and Tylenol. (Tr. 1553). She was directed to follow up with her rheumatologist. (*Id.*).

On April 5, 2021, Ms. Russell messaged Dr. Bucklan's office to report having spent the day in bed on Easter because of "an extremely bad migraine" with associated vomiting. (Tr. 1727). In a subsequent message on April 7, Ms. Russell indicated she had been experiencing three migraines a week. (Tr. 1725). Dr. Bucklan's nurse offered a prednisone taper. (*Id.*).

On April 23, 2021, Ms. Russell met with Dr. Perhala and reported feeling somewhat worse because she recently had Covid with pneumonia and had to stop taking methotrexate and sulfasalazine. (Tr. 2041, 2043). Dr. Perhala directed her to resume her medications. (Tr. 2043).

In May 2021, Ms. Russell met with Dr. Newton and reported fatigue that worsened with Covid. (Tr. 1908, 1912). Dr. Newton ordered labs to recheck vitamin B12 and recommended injections if B12 was low. (Tr. 1909). By September 9, Ms. Russell felt better with B12 injections and B12 pills but still felt fatigued. (Tr. 1930).

17

On June 14, 2021, Ms. Russell reported a reduction of moderate-to-severe migraine days a month, from ten to eight, and received a fifth round of Botox injections. (Tr. 1711-13).

On August 10, 2021, Ms. Russell returned to Dr. Perhala's office and reported her hands, wrists, shoulders, knees, and feet were slightly improved, though she ultimately stopped taking methotrexate because it caused diarrhea. (Tr. 2045). Dr. Perhala noted Ms. Russell would soon not have access to sulfasalazine and prescribed leflunomide as a replacement therapy. (Tr. 2047-48).

On September 22, 2021, Ms. Russell received her sixth round of Botox injections and reported a decrease to five moderate-to-severe headache days a month. (Tr. 2104). On September 27, Ms. Russell messaged Dr. Bucklan that she had a bad migraine for two days after her recent injection with bruising at the injection areas. (Tr. 2098). Between October and November, Dr. Bucklan prescribed another prednisone taper, a five-day course of a muscle relaxant, a three-day course of infusion therapy, and a Depakote taper. (Tr. 2297). Depakote was prescribed after Ms. Russell informed Dr. Bucklan that she had bad migraines after all three infusions. (Tr. 2069).

When Ms. Russell returned to Dr. Bucklan's office on December 9, 2021, she described new pain and numbness in her hands and up to her elbow, sleep disturbances, neck pain and stiffness, and daily headaches with nausea and vomiting for the past three months that are "more severe than ever before." (Tr. 2297). She reported struggling to function and care for her family. (*Id*.). Dr. Bucklan observed pain behaviors including rubbing the affected body part, tearfulness, and verbal complaints. (Tr. 2300). Neurological evaluation was normal. (Tr. 2301). Dr. Bucklan ordered another round of Botox injections and further testing. (*Id*.). An updated CT was normal. (Tr. 2295).

18

Before her seventh round of Botox injections on January 3, 2022, Ms. Russell reported 15 moderate-to-severe headache days a month and 5 mild headache days a month, with a decrease in migraine severity. (Tr. 2291).

On January 13, 2022, Ms. Russell returned to Dr. Kabbara's office and described shooting pain in her arms and hands that wakes her several times a night, and her arms becoming numb while holding the steering wheel and washing her hair. (Tr. 2253). She reported gabapentin had not helped. (*Id.*). Dr. Kabbara noted Ms. Russell's most recent cervical spine X-ray, dated December 30, 2021, showed mild retrolisthesis at C3-C4 and C4-C5, mild space narrowing at C4-C5 and C5-C6, and mild osseous foraminal encroachment on the right at C3-C4 and C4-C5 and on the left at C4-C5. (Tr. 2259). Dr. Kabbara advised her to increase the dose of gabapentin to 300 mg three times a day. (Tr. 2253).

On January 14, 2022, a cervical MRI showed mild degenerative disc disease with canal stenosis being worst at C5-C6 where there was a small right-sided disc protrusion superimposed on a disc bulge. (Tr. 2370).

On January 27, 2022, Dr. Kabbara administered a cervical epidural steroid injection at C7-T1. (Tr. 2237).

On February 11, 2022, Ms. Russell met with Tagreed Khalaf, M.D., for evaluation of her neck and arm pain. (Tr. 2277). She reported gabapentin and epidural steroid injection helped some of the arm symptoms. (Tr. 2278). Physical examination was unremarkable expect for paraspinal tenderness and pain with cervical range of motion testing. (Tr. 2280-81). Dr. Khalaf noted the EMG/CNS study was normal and did not show electrodiagnostic evidence of carpal tunnel syndrome or cervical radiculopathy. (Tr. 2281). He ordered additional testing. (*Id.*).

19

That same day, a cervical X-ray showed degenerative changes in the cervical spine, including minimal C3 on C4 retrolisthesis, without acute osseous findings and without evidence of inflammatory arthropathy. (Tr. 2516).

On February 24, 2022, Dr. Kabbara administered another epidural steroid injection at C7-T1. (Tr. 2478). When Ms. Russell met with Dr. Kabbara on March 31, 2022, she reported the injection significantly helped relieve her pain for four to five weeks before wearing off. (Tr. 2549). At the time, she endorsed pain radiating from the back of her neck to her shoulder blades. (*Id.*). Physical examination was normal. (Tr. 2554). Dr. Kabbara prescribed gabapentin 300 mg three times a day. (Tr. 2549).

On April 19, 2022, Dr. Kabbara administered another epidural steroid injection at C7-T1. (Tr. 2598). When Ms. Russell returned to Dr. Kabbara's office, she reported no relief with the most recent injection and continued to have pain at the base of her neck that radiated down the right shoulder and hand. (Tr. 2601). Even so, she endorsed being able to function and perform activities of daily living on an independent basis. (Tr. 2601). She had limited range of motion of the right shoulder, but examination was otherwise normal. (Tr. 2606). Dr. Kabbara increased gabapentin to 600 mg three times a day and referred her to a spine surgeon for evaluation. (Tr. 2600).

III.  MEDICAL OPINIONS

On June 30, 2021, State agency medical consultant Leon Hughes, M.D., reviewed Ms. Russell's medical records and determined she could occasionally lift and carry 20 pounds, 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or

scaffolds; and frequently balance, stoop, kneel, crouch, and crawl; and must avoid all exposure unprotected heights, hazardous machinery, or commercial driving. (Tr. 72-78). On November 11, 2021, State agency medical consultant Gerald Kylop, M.D., reviewed updated medical records and largely agreed with Dr. Hughes, but found Ms. Russell less limited in certain respects. He determined she could climb ramps and stairs frequently and climb ladders, ropes, and scaffolds occasionally; had an unlimited capacity to balance, kneel, and crouch; and must avoid *concentrated* exposure to hazards. (Tr. 98).

On November 10, 2021, Dr. Perhala completed a Medical Source Statement on Ms. Russell's behalf and determined she could lift and carry 5 pounds occasionally, 0 pounds frequently; can stand/walk for a total of 2 hours a day and for 15 minutes without interruption; can sit for a total of 6 hours a day and for 1 hour without interruption; can rarely climb, balance, stoop, kneel, crouch, and crawl; can rarely reach, push and pull, and perform gross manipulations; can occasionally perform fine manipulation; is restricted in her ability to work around heights, moving machinery, and temperature extremes; needs to alternate between sitting, standing, and walking at will; experiences severe pain that will interfere with concentration, take her off task, and cause absenteeism; and requires up to 1 hour of additional unscheduled rest periods. (Tr. 2003-04).

On July 9, 2021, State agency psychological consultant Jennifer Whatley, Ph.D., reviewed Ms. Russell's mental health records and found she was moderately limited in her abilities to carry out detail instructions, complete a normal workday and workweek with interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept

instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. (Tr. 89-90). As a result, Dr. Whatley determined Ms. Russell could perform simple, repetitive tasks, interact with others on a brief and superficial basis, and adapt to minor and infrequent changes in the work setting. (*Id.*). On October 28, 2021, State agency psychological consultant Courtney Zeune, Psy.D., affirmed Dr. Whatley's initial RFC. (Tr. 96).

## IV.   ADMINISTRATIVE HEARING

At the administrative hearing, Ms. Russell's representative provided a brief overview of Ms. Russell's medical conditions and stated the symptoms of those conditions would lead to absenteeism. (Tr. 48). Ms. Russell testified that since her car accident in 2018, her physical condition has worsened: she falls more, feels off balance, and is fearful of driving. (Tr. 57). She uses a cane when she leaves her home. (Tr. 61). The cane is helpful both for walking and for balancing. (*Id.*). Around the house, she holds onto walls and furniture to ambulate. (*Id.*). Her hands hurt so bad that the pain wakes her up from sleep. (Tr. 58). When her hands are numb, she cannot open even a bottle of water. (*Id.*). She struggles to write more than two words without pain. (*Id.*). Ms. Russell also suffers from migraine headaches that occur at least three times a month and can last for up to three or four days. (Tr. 59-60). Botox injections were initially helpful but have become less effective at controlling her headache pain. (Tr. 60). Ms. Russell also has stomach issues that cause her to "have diarrhea at least five times a day." (Tr. 68).

Ms. Russell lives with her three children. (Tr. 49). She can do some chores but receives help from her friend's daughter and from her own children. (Tr. 49). She can do laundry but cannot carry the laundry basket, can prepare simple meals, and can drive short distances. (Tr. 50-

51). She can bathe and dress herself but sometimes she falls in the shower. (Tr. 50). Ms. Russell

tries to do physical therapy exercises but gets dizzy and distracted. (Tr. 51). She sometimes listens

to audiobooks but does not watch television or use a computer because looking at them bothers

her eyes and increases her headache pain. (Tr. 51-52).

Ms. Russell belongs to a "twin club" because she has twin boys and belongs to a mother's

group that meets during the school year. (Tr. 52). She also attends church with her sons. (*Id.*).

The VE testified that a person of Ms. Russell's age, education, and work experience, with

the functional limitations described in the ALJ's RFC determination, could not perform past

relevant work but could perform work as an inspector and hand packager, mail clerk, and gluer.

(Tr. 65). The individual would be precluded from performing full-time work if further limited to

occasionally handling and fingering. (Tr. 67). Finally, the VE stated employers tolerate no more

than 15% off-task time during the workday and no more than two absences per month. (Tr. 66).

## V.    OTHER RELEVANT EVIDENCE

On July 1, 2021, Ms. Russell completed an Adult Function Report detailing how her

conditions limit her activities. (Tr. 270-77). She provided that rheumatoid arthritis limits her

ability to walk more than 5 to 15 minutes and causes trouble with bending and lifting. (Tr. 270,

275). Her conditions also affect her abilities to lift, squat, stand, reach, kneel, climb stairs,

complete tasks, and use her hands. (Tr. 275). On some days, the pain is so great that she must lie

down and struggles to dress and bathe. (Tr. 270-71). Ms. Russell wakes up in pain multiple times a

night. (Tr. 271). She prepares simple meals a few times each week and can do the dishes. (Tr. 272).

She does not perform yardwork because it is too painful to navigate steps and bend over. (*Id.*). Her

doctor prescribed a cane that she uses daily. (Tr. 276). She takes folic acid tablets and

23

methotrexate, both of which cause gastrointestinal side effects including diarrhea, abdominal pain, nausea, and vomiting. (Tr. 277).

Ms. Russell used to enjoy running every other day but cannot do that anymore. (Tr. 274). She talks with her mom and husband every day and goes to the grocery store once a week but does not participate in many social activities due to pain. (Tr. 274).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520, 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts

24

to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Russell had not engaged in substantial gainful activity since March 22, 2018. (Tr. 12). At Step Two, the ALJ identified the following severe impairments: IBS, migraine headaches, fibromyalgia, degenerative disc disease (cervical and lumbar), inflammatory polyarthropathy, rheumatoid arthritis without rheumatoid factor, neuropathy, adjustment disorder with mixed anxiety and depressed mood, and posttraumatic stress disorder. (Tr. 13). At Step Three, the ALJ concluded Ms. Russell does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Tr. 14).

The ALJ determined Ms. Russell's RFC as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, is able to stand and walk six hours of an eight-hour workday, is able to sit for six hours of an eight-hour workday, unlimited push and pull other than shown for lift and/or carry; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; frequently balance, stoop, kneel, crouch and crawl; can perform frequent handling and fingering bilaterally; avoid all exposure to hazards – no unprotected heights, hazardous machinery or commercial driving; can perform simple routine repetitive tasks (consistent with unskilled work); with superficial interaction with others (meaning of a short duration for a specific purpose); can perform work with infrequent change.

25

(Tr. 18).

At Step Four, the ALJ found Ms. Russell cannot perform her past relevant work. (Tr. 27). At Step Five, the ALJ determined jobs exist in significant numbers in the national economy that she can perform. (Tr. 28). Therefore, the ALJ found Ms. Russell was not disabled. (Tr. 29).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.,* 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.,* 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position,

the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## DISCUSSION

Ms. Russell brings two issues for review: (1) the ALJ erred in assessing Dr. Perhala's opinion; and (2) the ALJ's RFC is not supported by substantial evidence because the ALJ did not

include additional limitations. (ECF #11 at PageID 2667). The first argument is not persuasive, but the second is, and thus remand is warranted for the reasons described below.

I.     **The ALJ properly assessed Dr. Perhala's opinion in accordance with the regulations.**

Ms. Russell claims the ALJ erred because she selectively parsed the record, relying on "only a few treatment notes rather than looking at the majority of the notes" when assessing the persuasiveness of Dr. Perhala's medical opinion. (ECF #11 at PageID 2668).

Because Ms. Russell filed her application after March 27, 2017, medical opinions are evaluated under the regulations found in 20 C.F.R. §§ 404.1520c and 416.1920c. Under these revised regulations, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at §§ 404.1520c(b), 416.920c(b).

The regulations eliminated the hierarchy of medical source opinions that previously gave preference to treating source opinions. The ALJ need not defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors tending to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability and consistency. *Id.* at §§ 404.1520c(a),

28

416.920c(a). With respect to supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion, the more persuasive the medical opinion will be. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). Regarding consistency, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

An ALJ must explain how she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. § 416.920c(b)(2)-(3). That said, just because an ALJ does not specifically use the words "supportability" and "consistency" does not mean the ALJ failed to consider those factors. *Hardy v. Comm'r of Soc. Sec.*, No. 2:20-cv-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021).

Dr. Perhala treated Ms. Russell for inflammatory polyarthropathy and rheumatoid arthritis. The ALJ summarized the pertinent medical evidence, noting:

> As for rheumatoid arthritis, a thorough review of the record shows the claimant complained of joint pain on multiple occasions. Her condition is managed with Plaquenil. Additionally, a treatment note states rheumatology wanted the claimant to start methotrexate, but she had not because she was fearful of the side effects. A treatment note from March 2021 states the claimant experienced mild control of her arthritis pain with stiffness, but the pain in her hands, wrists, shoulders, knees and feet was better. The treatment note further states most of the claimant's joints are stable. On physical examination, the claimant exhibited no significant abnormalities aside from some tenderness. The claimant also exhibited normal sensation to touch, temperature, vibration, and pinprick as well as full motor strength. In general, the claimant exhibited no significant abnormalities on physical examination except for some tenderness.

(Tr. 22) (citations omitted). Then, the ALJ assessed Dr. Perhala's opinion as follows:

Treating physician R. Perhala, M.D., opined in November 2021 the claimant can lift and/or carry five pounds occasionally and zero pounds frequently; stand/walk a total of two hours in an eight-hour workday, one-fourth of an hour without interruption; can sit a total of six hours in an eight-hour workday, one hour without interruption; rarely climb, balance, stoop, kneel, crouch, and crawl; rarely to occasionally reach, rarely push/pull, occasionally perform fine manipulation, rarely perform gross manipulation; has environmental restrictions that affect heights, moving machinery, and temperature extremes; needs to be able to alternate positions between sitting, standing, and walking at will; requires unscheduled breaks; and her pain will interfere with concentration as well as require her to be off task and miss work at times.

The undersigned finds Dr. Perhala's opinion unpersuasive. The opinion is not supported by Dr. Perhala's treatment notes. For example, months prior to the opinion in August 2021, the claimant's arthritis was described as under "fair control." Additionally, the stiffness and pain in the claimant's upper and lower extremities were described as "slightly improved." On physical examination, the claimant generally exhibited tenderness in the bilateral elbows, wrists, fingers, knees, ankles, feet and toes as she generally did with full range of motion. She also exhibited full motor strength in the upper and lower extremities and no significant neurological abnormalities. These physical examination findings are internally inconsistent with the overly restrictive limitations opined by Dr. Perhala. Furthermore, as stated above, an electromyography and nerve conduction studies found no evidence of cervical radiculopathy or median mononeuropathy at the wrist, and a normal upper right extremity, which is inconsistent with the portion of the opinion that indicates the claimant can occasionally perform fine manipulation and rarely perform gross manipulation. Similarly, electromyography and nerve conduction studies combined with imaging of the cervical spine and lumbar spine are inconsistent with limiting the claimant to lifting and/or carrying up to five pounds occasionally.

(Tr. 25) (citations omitted). The ALJ evaluated the supportability and consistency of Dr. Perhala's medical opinion and explained how those factors informed his assessment, relying largely on the lack of objective medical findings in Dr. Perhala's treatment notes and other medical records, including normal EMG/NCS studies and mild findings noted in MRIs, CT scans, and X-rays of the lumbar and cervical spine. (*Id.*).

Ms. Russell claims the ALJ ignored certain evidence that, if accepted, would have changed her analysis, including her reported fatigue, pain, and weakness. (ECF #11 at PageID 2670). The

record indicates Ms. Russell complained of a mild degree of fatigue to Dr. Perhala in April 2020 and January, March, and August 2021 (Tr. 2015, 2033, 2037, 2045). Later, in September 2021, Ms. Russell reported she was still fatigued but feeling better after receiving vitamin B12 injections. (Tr. 1930). Although the ALJ did not expressly address Ms. Russell's reported complaints of fatigue, the evidence does not suggest that mild fatigue at least somewhat improved with injections would impact the ALJ's analysis or lend support for Dr. Perhala's opined limitations. Moreover, the ALJ's conclusion is supported by substantial evidence, including largely normal physical examinations showing full range of motion, intact sensation, normal strength and neurological evaluations, and normal or mildly abnormal findings on diagnostic testing and images.

To the extent Ms. Russell argues that joint tenderness without range of motion deficits, a slightly antalgic gait, and her reports of pain, fatigue, and weakness show supportability and consistency, her argument is not persuasive because even if this evidence amounted to substantial evidence supporting her position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Because the ALJ evaluated the persuasiveness of Dr. Perhala's medical opinion in accordance with the regulations and substantial evidence supports the ALJ's conclusions about the doctor's opinion, I decline to remand on this basis.

## II.    The ALJ's RFC assessment is not supported by substantial evidence.

Ms. Russell also argues the evidence supports additional limitations to account for symptoms related to her upper extremities, difficulty walking, and migraines. (ECF #11 at PageID 2672-76). Because the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

31

unsupported by substantial evidence in the record," *Walters,* 127 F.3d at 528, I do not analyze whether substantial evidence supports the limitations proposed by Ms. Russell, but whether substantial evidence supports the ALJ's RFC set forth in the written decision.

A claimant's RFC is defined as the most a claimant can still do despite the physical and mental limitations resulting from his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ alone determines a claimant's RFC. *Id.* at §§ 404.1546(c), 416.946(c). The RFC must be based on all relevant evidence in the record, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. *Id.* at §§ 404.1545(a), 416.945(a); *see also Henderson v. Comm'r of Soc. Sec.,* No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010).

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2017 WL 5180304. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.*

At the second stage, recognizing that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence, the ALJ considers the entire case record, including the objective medical evidence; the individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and

32

any other relevant evidence in the individual's case. *Id.* In addition, the ALJ uses the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) to evaluate the individual's statements:

1.   A claimant's daily activities;

2.   The location, duration, frequency, and intensity of pain or other symptoms;

3.   Factors that precipitate and aggravate the symptoms;

4.   The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5.   Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6.   Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7.   Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors, only those germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints and may discount subjective testimony when the ALJ finds those complaints are inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ may not reject an individual's statements about her symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged but must carefully consider other evidence in the record. *See* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *see also* SSR 16-3p, 2017 WL 5180304, at *6.

33

The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10. The ALJ's evaluation must be limited "to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments." *Id*. at *11. The ALJ need not use any "magic words," so long the decision as a whole makes clear why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

### A. Migraines

Related to migraines, Ms. Russell argues they are triggered by too much exposure to bright lights and claims the severity and frequency of her migraines would result in her excessive absence from work. (ECF #11 at PageID 2673). First, although Ms. Russell described light sensitivity as a trigger for migraines initially after her car accident in 2018 (*See* Tr. 325), she testified at the hearing that lights "do[n't] seem to bother [her] now." (Tr. 60). Because Ms. Russell's own testimony does not support a limitation to avoid concentrated exposure to light, I find no reason to remand on this basis.

34

As to absenteeism, Ms. Russell claims the severity of her migraines and associated symptoms, including nausea, vomiting, and phonophobia, would result in two or more absences a month and Dr. Perhala "stated the migraines would cause absenteeism." (ECF #11 at PageID 2673). As a point of clarity, Dr. Perhala evaluated Ms. Russell for fatigue and joint pain and treated her for inflammatory arthritis, not headaches or migraines. (Tr. 2011, 2021, 2029, 2045). His opinion regarding absenteeism only reasonably extends to absenteeism caused by pain associated with inflammatory arthritis, not her head pain.

The ALJ summarized Ms. Russell's treatment history for migraines as follows:

Regarding migraines, the claimant testified she experienced migraines prior to her motor vehicle accident in March 2018, but her symptoms were manageable with medication. The claimant testified her current abortive pain medication is not effective. She further testified Botox injections are no longer as effective as they were in the past. The claimant testified the Botox injections "take the edge off." The claimant further testified her migraines can last up to four days. She testified she experiences migraines at least three times a month and they are random with no known triggers.

A review of the record shows her condition was treated with prescription medication, including gabapentin, Elavil, Ubrelvy and Maxalt. The claimant also reported little relief with ibuprofen. Additionally, a treatment note states the claimant did not find Imitrex, gabapentin, Topamax or nortriptyline helpful. A July 2020 treatment note states the claimant was referred to acupuncture for her pain.

In August 2020, the claimant reported a worsening of her migraines after experiencing one week of relief after a Botox injection in mid-July 2020. The claimant was advised to contact her provider for oral steroids or intravenous infusion if she experienced a migraine lasting more than three days.

In November 2020, the claimant presented to the emergency department with a migraine. According to the emergency department treatment note, the claimant had the migraine for the past three days with nausea and vomiting. The claimant reported she was not due for another Botox injection for a few weeks and rated her pain as an 8/10. The claimant as treated and discharged with a prescription for Toradol and Zofran.

Overall, the record shows the claimant received some relief with medication and Botox injections, but she continued to experience migraine symptoms. Although the claimant reported her migraines were random and there were no known triggers, treatment notes indicate the claimant reported anxiety and guilt fuel her headaches.

\* \* \*

In addition to no significant abnormalities on mental status examinations, the claimant was able to perform activities of daily living as well as activities that require the ability to adapt and manage oneself during the period at issue. For example, the claimant was a substitute teacher at her children's school for up to four times a week for a full day in late 2018, which is physically and mentally demanding. The claimant was also working on a bachelor's degree in teaching but has not completed her degree, which requires the ability to remember, concentrate, and apply knowledge. Moreover, the claimant reported an ability to manage her home life with mild difficulty.

\* \* \*

As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because they are not wholly supported by objective evidence. For instance, despite the claimant's testimony regarding use of a cane, the claimant was described as exhibiting normal gait and ambulating independently on multiple occasions. Additionally, the claimant testified her hands go numb while in the shower, yet she is able to lift her six-year-old twins during the period under review. Moreover, a September 2021 electromyography found no evidence of cervical radiculopathy or median mononeuropathy of the wrist. An ulnar nerve conduction study shows a normal right upper extremity. Additionally, she generally exhibited full motor strength and intact sensation to light touch, which is inconsistent with neuropathy. As for the claimant's mental impairments, as stated above, she generally appeared well developed, well nourished, alert and oriented as well as exhibited appropriate mood and affect. She also taught as a substitute teacher up to four times a week for a full day in late 2018, and she was the primary caregiver for her young children, including a set of twins and a special needs child. The record indicates she had limited ability to attend appointments due to being a mother of three young boys. Despite allegations of anxiety, the claimant attended gatherings such as weddings and birthday parties.

(Tr. 20, 22, 23-24).

The ALJ summarized some of the treatment records and testimony relevant to Ms. Russell's migraines, the effectiveness of her treatments, and her daily activities. But the ALJ erred because she did not explain why the evidence failed to support the claimed severity of Ms. Russell's migraines such that she would be absent from work more often than is tolerated by employers. Although the ALJ explained why the evidence did not support other limitations and how evidence was inconsistent with Ms. Russell's statements about her other conditions, the ALJ did not do so with respect to her migraines.

The ALJ's decision "need not be so comprehensive as to account with meticulous specificity for each finding and limitation, nor is the ALJ required to discuss every piece of evidence in the record." *Correa v. Comm'r of Soc. Sec.*, No. 1:23-cv-685, 2023 WL 9064960, at *10, (N.D. Ohio Dec. 14, 2023) (citations omitted), *report and recommendation adopted*, 2024 WL 37877 (N.D. Ohio Jan. 3, 2024). But the ALJ must "provide sufficient explanation for the claimant and any reviewing court to 'trace the path of h[er] reasoning'" and explain "with specificity" how the evidence supports the RFC limitations. *Id.* at *10 (citations omitted).

The evidence suggests Ms. Russell suffered from frequent migraines that could last for days at a time and kept her in bed and the multiple medications, injections, and infusions did little more than "take the edge off." Although she indicated some of the treatments were helpful, the effectiveness wore off or diminished, such that she continued to suffer from migraines. These statements do not appear inconsistent with other evidence in the record, but the ALJ did not engage with them, and therefore, I am unable to determine the reasons for either including or excluding limitations related to Ms. Russell's migraines and whether those reasons are supported by substantial evidence. For this reason, I find the ALJ did not build the required logical bridge

37

between the evidence and her conclusions, and that failure prevents me from engaging in meaningful judicial review. *See Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 409 (6th Cir. 2009).

The ALJ's error is not harmless. Ms. Russell argues the evidence regarding her migraines supports RFC limitations for absenteeism that are work preclusive. (ECF #11 at PageID 2673). The VE testified employers do not tolerate more than two absences per month, and that an individual who needed to be absent more often would be unable to perform any competitive employment. (Tr. 66).

### B.    Upper Extremities

Next, Ms. Russell claims the evidence warrants "significantly greater limitations" with respect to her handling, fingering, and reaching capabilities. (ECF #11 at PageID 2675). In support, she relies on her own reports of right arm and hand pain, associated fatigue and weakness, and a single instance of limited right shoulder mobility. (*Id.* at PageID 2674).

The ALJ considered Ms. Russell's treatment history, the effects of treatment, and her daily activities and determined the evidence only supported limitations to frequent handling and fingering and no limitations in reaching. (Tr. 24). In so doing, the ALJ relied on Ms. Russell's reports of 90% improvement with spinal injections, the mild MRI, X-ray, and CT findings in her cervical and lumbar spine, the normal electromyography and nerve conduction studies, the consistent findings of normal motor strength and intact sensation, and the consistent findings of tenderness in her upper extremities. (Tr. 20, 23-24). This evidence substantially supports the ALJ's conclusion. I therefore decline to order remand on this basis.

### C .    Use of a cane

38

Last, Ms. Russell believes the ALJ erred by omitting from the RFC her need for a cane. (ECF #11 at PageID 2675). She argues the medical records support her need for a cane, citing her balance issues and frequent falls, and her doctor prescribed it to her. (*Id.* at PageID 2676). But the ALJ reasonably determined the evidence did not support a need for a cane because the records show Ms. Russell exhibited normal gait and ambulated independently (Tr. 23) and treatment notes state she does not need assistance with sitting, standing, or walking and does not need assistance walking in her home or in unfamiliar settings (Tr. 27). This evidence substantially supports the ALJ's conclusion.

\* \* \*

In conclusion, the ALJ erred by failing to build a logical bridge between the evidence and her conclusions with respect to Ms. Russell's migraine headaches. Because the error is not harmless, remand is required.

### Conclusion

Following review of the arguments presented, the record, and the applicable law, I **REVERSE** the Commissioner's decision denying disability insurance benefits and supplemental security income and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: August 2, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE